# In the United States Court of Federal Claims

BID PROTEST
No. 16-427C
Filed Under Seal: November 30, 2016
Reissued for Publication: January 3, 2017[*]

_____

PARCEL 49C LIMITED
PARTNERSHIP,

     Plaintiff,

v.

THE UNITED STATES,

     Defendant,

v.

TRAMMELL CROW COMPANY,

     Defendant-Intervenor.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Pre-Award Bid Protest; Judgment upon
the Administrative Record, RCFC 52.1;
Organizational Conflict of Interest;
Supplementing the Administrative
Record.

    *Richard J. Conway*, Counsel of Record, *Daniel A. Broderick*, Of Counsel, Blank Rome
LLP, Washington, DC, *Michael J. Slattery*, Of Counsel, Blank Rome, LLP, New York, NY,
*Larry D. Blust*, Of Counsel, Hughes Socol Piers Resnick & DYM, LTD., Chicago, IL, for
plaintiff.

    *William J. Grimaldi*, Trial Attorney, *Douglas K. Mickle*, Assistant Director, *Robert E.
Kirschman, Jr.*, Director, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General,
Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington,
DC, *Michael P. Klein*, Assistant Regional Counsel, United States General Services
Administration, Washington, DC, for defendant.

    *Stuart W. Turner*, Attorney of Record, *Ronald A. Schechter*, Of Counsel, *Amanda
Johnson*, Of Counsel, Arnold & Porter LLP, Washington, DC, for defendant-intervenor.

---

[*] This Memorandum Opinion and Order was originally filed under seal on November 30, 2016 (docket
entry no. 79), pursuant to the Protective Order entered in this action on April 6, 2016 (docket entry no.
10). The parties were given an opportunity to advise the Court of their views with respect to what
information, if any, should be redacted under the terms of the Protective Order. The parties filed a joint
status report on December 22, 2016 (docket entry no. 87) proposing certain redactions, which the Court
has adopted. Accordingly, the Court is reissuing its Opinion and Order dated November 30, 2016, with
the adopted redactions indicated by three consecutive asterisks within brackets ([***]).

## **MEMORANDUM OPINION AND ORDER**

GRIGGSBY, Judge

## I.      INTRODUCTION

Plaintiff, Parcel 49C Limited Partnership ("Parcel 49C"), brought this pre-award bid protest matter challenging several actions taken by the United States General Services Administration ("GSA") in connection with the GSA's evaluation of proposals in response to a request for lease proposals to procure office space for the headquarters of the Federal Communications Commission ("FCC").  The government has moved to partially dismiss this matter for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  The government, Parcel 49C, and the defendant-intervenor in this matter, Trammell Crow Company ("Trammell Crow"), have also filed cross-motions for judgment upon the administrative record, pursuant to RCFC 52.1.  In addition, Parcel 49C has filed a motion to supplement the administrative record, a motion for leave to file a sur-reply and a motion to file certain documents under seal, pursuant to RCFC 7(b).

For the reasons set forth below, the Court: (1) **GRANTS** the government's motion for judgment upon the administrative record and Trammell Crow's motion for judgment upon the administrative record; (2) **DENIES** Parcel 49C's motion for judgment upon the administrative record; (3) **DENIES** Parcel 49C's motion to supplement the administrative record; (4) **GRANTS** Parcel 49C's motion to file certain documents under seal and motion for leave to file a sur-reply; and (5) **DENIES**, as moot, the government's partial motion to dismiss.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  Factual Background

In this pre-award bid protest matter, Parcel 49C alleges that the GSA committed several errors in connection with the agency's evaluation of proposals submitted in response to a request for lease proposals (the "RLP") to procure office space for the headquarters of the FCC ("the FCC Lease"). Pl. 2d. Am. Compl. ¶¶ 1-9. Specifically, Parcel 49C alleges that the GSA's evaluation of responsive proposals was unreasonable and not in accordance with the terms of the RLP or applicable law.

In this regard, Parcel 49C challenges the GSA's evaluation upon five grounds. First, Parcel 49C alleges that the GSA should have determined that Trammell Crow is ineligible for award of the FCC Lease due to an organizational conflict of interest ("OCI") that cannot be mitigated and because Trammell Crow was not a single owner of the property that it proposes for the FCC Lease at the time that Trammell Crow submitted its proposal. *Id*. at ¶¶ 160-79. Second, Parcel 49C alleges that certain requirements in the RLP unduly restrict competition and prejudice Parcel 49C. *Id*. at ¶¶ 96-108. Third, Parcel 49C alleges that the GSA improperly required Parcel 49C to provide certain National Environmental Policy Act ("NEPA") documentation in connection with Parcel 49C's offer, in violation of the RLP's terms and applicable law. *Id*. at ¶¶ 143-51. Fourth, Parcel 49C alleges that the GSA's evaluation of responsive proposals was improper, because the agency did not consider certain relocation and move-related costs in connection with its evaluation of the price for the FCC Lease and because the GSA's Independent Government Estimate ("IGE") has not been properly documented by the agency. *Id*. at 109-42; Pl. 2d. Mem. at ¶¶ 24-46. Lastly, Parcel 49C alleges that the GSA failed to conduct meaningful discussions with Parcel 49C regarding its proposed price. Pl. 2d. Am. Compl. at ¶¶ 152-159.

As relief, Parcel 49C requests that the Court order the GSA to reject Trammell Crow's proposal or, alternatively, enjoin the GSA from awarding the FCC Lease. *Id*. at ¶¶ 43-44.

---

[1]The facts recited in this Memorandum Opinion and Order are taken from the administrative record ("AR"); the supplemental administrative record ("SAR"); plaintiff's second amended complaint ("Pl. 2d. Am. Compl."); and plaintiff's memorandum in support of its motion for judgment upon the amended administrative record ("Pl. 2d. Mem.").

### 1.   The Request For Lease Proposals

Parcel 49C is the current lessor of a building located at The Portals II, 445 12th Street, SW, Washington, DC, which currently houses the headquarters of the FCC under a previous lease.  AR at 1450.  This lease will expire on October 16, 2017.  *Id*. at 26.

On September 21, 2015, the GSA issued the RLP to procure office space to house the headquarters of the FCC in Washington, DC after the current lease expires.  *Id.* at 1427-1697. The RLP provides that the subject lease is expected to be for a 15-year term and that the occupancy date under the lease is expected to be between October 18, 2017 and December 31, 2019.  *Id*. at 1431.  In addition, the RLP also provides that "[t]he Lease will be awarded to the responsible Offeror whose offer . . . is the lowest priced technically acceptable offer submitted." *Id*. at 1446.

Prior to issuing the RLP, the GSA retained the services of CBRE, Inc. ("CBRE") to provide broker services related to the RLP, pursuant to a professional services contract for real estate consulting and other services.  *Id*. at 2918.  Consistent with its standard practice, the GSA required CBRE to conduct a preliminary survey of building locations that were eligible to submit bids in connection with the RLP.  *Id*.  This survey revealed that CBRE had three potential conflicts of interest, including a potential conflict with respect to the FCC's incumbent lessor, Parcel 49C.  *Id*. at 2923.

There are several provisions in the RLP that are relevant to Parcel 49C's claims in this matter.

First, the RLP contains certain requirements regarding the minimum ceiling height for the space offered for the FCC Lease, as well as a requirement for power redundancy through dual power feeds.  *Id*. at 1497.  Specifically, the RLP provides that "[t]he first (1st) floor of the offered building must have a minimum finished ceiling height of 11'6." *Id*.  The RLP also contains a requirement regarding dual power feeds, which provides that:

> The Government requires power and communication circuits that have more than one point of entry coming into the Building (multiple independent conduits coming from the street to the facility, with at least 25 feet of physical separation). The Government requires redundancy for communications and power. Communications requires dual redundant 10-gigabit circuit, with more than one cable infrastructure. . .

4

*Id.* (Exhibit B, paragraph 11).

Second, the RLP contains a requirement that the space to be leased must be owned by a single owner.  *Id*. at 1687.  In this regard, paragraph 1.02, subparagraph C of the RLP provides that:

> Offered space must be contiguous (with the exception of the ground level/first floor space referenced in paragraph 1.02.A. above) and accommodated in no more than one (1) building, as determined by the LCO [Lease Contracting Officer]. To qualify as one (1) building, offered space must be owned by a single Offeror and the structures, if more than one, must be connected internally on at least 60% of the offered floors as determined by and at the discretion of the LCO.

*Id*. at 1687.

Third, the RLP contains several provisions to address potential conflicts of interest involving the broker for the RLP, CBRE.  Specifically, paragraph 1.13, subparagraph A of the RLP provides that:

> For the purposes of this RLP, CBRE, INC. (the Broker) is the authorized contractor real estate broker representing GSA. Offerors are advised that there is a potential for a dual agency situation to arise under this procurement, whereby the Broker may represent both GSA and another Offeror under this lease action. By submitting an offer, the Offeror acknowledges the potential for a dual agency situation. Should there be an actual dual agency, the Broker will notify all Offerors of the actual dual agency and request written acknowledgement statements from all Offerors.

*Id*. at 1433-34.  In addition, paragraph 3.06, subparagraph H of the RLP also provides that:

> If there is a potential for conflict of interest because of a single agent representing multiple owners, present evidence that the agent disclosed the multiple representation to each entity and has authorization from each ownership entity offering in response to this RLP package. Owners and agents in conflicting interest situations are advised to exercise due diligence with regard to ethics, independent pricing, and Government procurement integrity requirements. In such cases, the Government reserves the right to negotiate with the owner directly.

*Id*. at 1442.

In addition, the RLP includes a requirement that offerors provide documentation related to compliance with NEPA.  In this regard, paragraph 2.11, subparagraph B of the RLP provides, in relevant part, that:

The Government reserves the right to reject any offer where (i) the NEPA-related documentation provided by the Offeror for the offered Property is inadequate, (ii) the offer entails unacceptably adverse impacts on the human environment, (iii) the identified adverse impacts cannot be readily mitigated, or (iv) the level of NEPA analysis is more extensive than is acceptable to the Government (*e.g.*, offers must be of a nature that would allow NEPA to be satisfied by preparation of a Categorical Exclusion (CATEX) NEPA study or an Environmental Assessment (EA) with or without mandatory mitigation).

*Id*. at 1438.  Section 5.03 of the RLP also provides, in relevant part, that:

Any offer must provide a basis for GSA to determine that award of a lease involving the offered building(s) will, under the National Environmental Policy Act (NEPA – 42 U.S.C. Sec. 4321, *et seq*.), as implemented in the GSA NEPA Desk Guide (October 1999), either result in: 1) a Categorical Exclusion (CATEX) from the requirement to prepare an Environmental Assessment (EA) or an Environmental Impact Statement (EIS), or 2) Finding of No Significant Impact (FONSI) as the result of performing an EA. Any offer that, in GSA's opinion, would require preparation of an EIS shall be considered technically unacceptable and ineligible for award.

*Id*. at 1450.

The RLP also contains a provision to address the fact that the current location of the FCC's headquarters could be renovated to meet the agency's future needs.  In this regard, the RLP provides in paragraph 5.04, subparagraph A that:

A renovation of The Portals II may be a potential solution for this procurement. A renovation of The Portals II will be required to: I) meet all the requirements of the current GSA Request for Lease Proposals (RLP) and Lease Form L201C; II) bring the existing structure and tenant areas up to a LEED-CI, Silver, rating in accordance with the U.S. Green Building Council requirements; and III) reconstruct the majority of the tenant's space to meet the occupancy density required in the approved Prospectus.

*Id*. at 1450.

Lastly, the RLP contains several significant provisions regarding the evaluation of the price proposed by each offeror for the FCC Lease.  Specifically, the RLP describes the factors that the GSA will consider in its evaluation of each offerors' price, including move-related and relocation costs, and provides, in relevant part, that:

Evaluation of offered prices will be based on the annual price per [American National Standards Institute/Building Owners and Managers Office Area Square Feet ("ABOA SF")], including all required option periods.  The Government will perform present value price evaluation by reducing the price per ABOA SF to a composite annual ABOA SF price, as follows . . .

6

> 7.  To the gross PVC [present value cost] will be added: . . .
> d.        The cost of relocation of furniture, telecommunications, replications
> costs, and other move-related costs, if applicable.

*Id*. at 1447.

To develop an IGE for the FCC Lease, the GSA engaged an architectural firm, OLBN, to study the FCC's space needs.  *Id*. at 336- 442; SAR at 2.  To that end, on April 21, 2015, OLBN provided the agency with a program of requirements ("POR") to help the GSA estimate the costs associated with the FCC Lease.  SAR at 6-355.

On July 26, 2016, the government submitted the Declaration of the GSA's Project Manager for the RLP, Cirilo Paulo, which explains the development of the IGE for the FCC Lease based on the POR.  *Id*. at 1-5.  In the declaration, Mr. Paulo states that OLBN "prepared an extensive POR based upon an in-depth examination of FCC needs, including extensive employee interviews to gain first-hand input from FCC staff."  *Id*. at 2.  Mr. Paulo also states that, "[a]fter compiling a summary of improvements required by the FCC, OBLN priced its estimate of the costs to accomplish the work, based upon its professional knowledge of the costs prevailing in the Washington DC market for the work described."  *Id*.

Mr. Paulo further states in the declaration that, after OBLN arrived at its "estimate of the costs to accomplish the work," he reviewed OLBN's estimated costs and "used these estimates as the starting point in formulating the final IGE for the FCC project."  *Id*.  With respect to the development of the IGE, Mr. Paulo also states in his declaration that he relied upon his "knowledge of current construction costs," due to his experience managing the new build-out of incumbent leased space for the NASA headquarters.  *Id*. at 2.  In this regard, Mr. Paulo states that he compared the costs in OLBN's estimates with his own experience with the NASA project and that he found the prices in OLBN's POR to be "realistic, and broadly consistent with [his] own experience."  *Id.* at 3.

Mr. Paulo also states that he made certain adjustments to the cost estimates contained in the POR based upon his experience.  *Id*.  In this regard, Paulo describes several adjustments that he made to OLBN's cost estimates:

> In response to these concerns, and in recognition that an IGE is intended to
> provide a basis for the tenant agency to budget adequate funds for the anticipated
> build-out, I made adjustments to certain cost estimates in the POR. These changes
> included both increasing assumed unit costs, as well decreasing assumed

administrative charges.  I also corrected certain assumptions as to what Tenant Improvement Allowance (TIA) and Building Specific Amortized Capital (BSAC) funds would be available to defray out-of-pocket build-out costs.

a. I increased the per square foot construction cost estimates for the general office space and both the Low Cost Special Space and High Cost Special Space build-outs.

b. I increased the TIA from $35.00 to $46.74 to reflect the correct allowance available for this lease procurement.

c. I deleted the costs of a swing move from the "stay in place" scenario to reflect that the Government would only pay for one move.  Move costs were thus $5.00 per usable square foot for both scenarios.

d. I subtracted the BSAC, which is an allowance available to FCC to fund security costs, from both scenarios.  The BSAC is an additional allowance available for the new lease, which would decrease the FCC's out-of-pocket build-out costs.

e. I decreased both scenario's [sic] design cost percentage from [***] percent to [***] percent.  This was done to reflect the fact that architectural firms are willing to take on large dollar projects such as this one for a lesser overall percentage charge than is the case for smaller dollar projects.

f. I decreased both scenario's [sic] lessor's fee from [***] percent to [***] percent.  Once again, this is to reflect the market's acceptance of a lower percentage commission on large dollar projects.

*Id*. at 3-4 (internal citations omitted).

## 2.   Evaluation Of Proposals Submitted By Parcel 49C And Trammell Crow

Parcel 49C and Trammell Crow both timely submitted proposals in response to the RLP on October 20, 2015.  AR at 1715-2426.  After receiving these proposals, the GSA held discussions with the offerors and subsequently requested that Parcel 49C and Trammell Crow provide their Final Proposal Revisions ("FPR") by December 15, 2015.  *Id*. at 785-87, 1703-04.

The GSA's correspondence with both offerors during the evaluation of their initial proposals shows that the GSA identified some deficiencies in both proposals.  *Id*. at 1702-14. Specifically, with respect to Parcel 49C's proposal, the GSA requested that Parcel 49C provide the [***] required by the RLP.  *Id*. at 1703-04.  The GSA also expressed a concern about how Parcel 49C's final proposal addressed the RLP's [***] requirement.  *Id*. at 1707, 1712.

With respect to Trammell Crow's proposal, the GSA expressed concern that the initial proposal did not include certain registration information that would "be needed for [a] final single ownership entity" and the agency requested that Trammell Crow "describe [the] process that will need to be completed to create [a] single ownership entity. *Id*. at 1706; *see also id*. at 1713-14.

Parcel 49C and Trammell Crow both timely submitted their FPRs to the GSA on December 15, 2015, and both offerors further revised their respective proposal at the GSA's request on April 11, 2016. *Id*. at 1707-09, 2427-879. Specifically relevant to this dispute, Trammell Crow described how it could create a single ownership entity to satisfy the RLP's single owner requirement in its FPR. *Id*. at 2782, 2807-08. In this regard, Trammell Crow provided the GSA with an opinion letter from its special counsel describing the process through which Trammell Crow could form a new entity to qualify as a single owner under the RLP upon condition of a lease award. *Id*. at 2807-08.

Following the evaluation of the proposals submitted by Parcel 49C, Trammell Crow, and three other offerors, the GSA determined that Trammell Crow offered the lowest-priced, technically-acceptable offer. *Id*. at 30, Pl. 2d. Mem. at 23-26. And so, the GSA intends to award the FCC Lease to Trammell Crow. *Id*.

### 3. Alleged Organizational Conflicts Of Interest

The GSA also conducted two investigations into alleged organizational conflicts of interest arising from CBRE's business relationship with Trammell Crow. In April 2016, CBRE and Trammell Crow executed a "Dual Agency Disclosure" form, which identified a dual agency relationship between the two companies. *Id*. at 2928-31. On April 18, 2016, CBRE notified the GSA's Contracting Officer's Technical Representative ("COTR"), Kevin Terry, and other GSA contracting personnel, that a dual agency situation existed with respect to the RLP, because the GSA received "an offer from Sentinel Square III," which is "represented by Trammel[l] Crow, Inc., a wholly owned subsidiary of CBRE." *Id*. at 2924. Thereafter, the GSA investigated potential organizational conflicts of interest involving CBRE and Trammell

Crow in light of this dual agency disclosure.[2]   AR at 2924-26.

On April 26, 2016, the GSA National Capital Region Regional Contracting Officer, Aliza Brown, issued a "National Broker Contract Contracting Officer Finding and Determination" with regard to the disclosed dual agency relationship between CBRE and Trammell Crow.  *Id*. at 2924-31.  In her findings, Ms. Brown determined that, although an organizational conflict of interest exists, it was "in the Government's best interest to retain CBRE's project team under [the FCC] procurement," because of the size and complexity of that procurement.  *Id*. at 2925.  With regard to mitigating this OCI, Mr. Brown also found that CBRE had "established a conflict wall in accordance with the contract requirements to appropriately safeguard procurement sensitive data, thereby preserving procurement integrity."  *Id*.  In addition, she also determined that CBRE "provided the required dual agency notifications to all interested parties in the lease procurement" and, as a result, "the identified organizational conflict of interest had been satisfactorily mitigated per requirements of the" Federal Acquisition Regulation ("FAR").  *Id*.

The GSA conducted a second OCI investigation related to CBRE's business relationship with Trammell Crow after Parcel 49C commenced this litigation.  In this regard, on July 22, 2016, the GSA's COTR, Kevin Terry, issued "Findings and Determinations in Regard to Adequacy of Safeguards Against Organizational Conflicts of Interest."  *Id*. at 2918-21.  In his findings, Mr. Terry detailed the actions that he undertook to investigate and directly address Parcel 49C's allegation that Trammell Crow had a potential undisclosed conflict of interest with respect to CBRE and "to ensure the integrity of the procurement and the protection of the government's interests."  *Id*. at 2919.

First, Mr. Terry states that he "approached CBRE for information about the alleged conflict."  *Id*.  Mr. Terry also states that he found that "[t]he fact that CBRE and Trammell Crow Company have [a common ownership] relationship does not necessarily create a conflict of interest as described in FAR 9.500, because the entities function as independent businesses and the connection between the entities is remote."  *Id*. at 2920.  In this regard, Mr. Terry determined

---

[2] On September 29, 2014, CBRE also disclosed a potential organizational conflict of interest related to the fact that CBRE represented Parcel 49C, which is the lessor for the incumbent location of the FCC headquarters.  AR at 2918, 2922-23.  CBRE also disclosed at that time that it might represent other potential offerors for new construction projects in the future. *Id*. at 2918.

that "Trammel[l] Crow Company . . . represents itself as a[n] independently operated business entity, not as an alter ego of CBRE." *Id*. And so, Mr. Terry concluded that:

> A connection at this remote level is a lesser cause for concern than arises when the same brokerage firm represents both sides in a transaction, since the opportunity for improper sharing of information between rival separate brokerage firms with a common corporate ownership is less than the opportunities that might arise when two separate broker teams within the same brokerage firm are on opposite sides in a competitive procurement action.

*Id*.

In his findings and determinations, Mr. Terry also states that "the [***] and safeguards [that CBRE has] in place that are adequate to mitigate the possibility of an internal organizational conflict of interest within CBRE itself, are certainly adequate to mitigate the possibile [sic] organizational conflict of interest that might exist between rival firms in common ownership." *Id*. Mr. Terry also "made further inquiries of CBRE pursuant to FAR 9.504(e)." *Id*. at 2921. From those inquiries Mr. Terry states that he learned "that Trammel[l] Crow Company [***]. *Id*. at 2921. Mr. Terry also found that "CBRE and Trammel[l] Crow Company [did] not [***], and the economic interests of the two firms, and the brokers employed by each, are not aligned even to the same extent as is the case for CBRE, which has brokers representing both Parcel 49C and GSA within the same brokerage firm." *Id*. And so, Mr. Terry found a "lack of any substantive issue concerning [a] potential organizational conflict of interest" pursuant to the FAR. *Id*.

After completing his investigation, Mr. Terry states that he determined that "the common ownership interest between CBRE and Trammel[l] Crow Company likely does not create a conflict of interest as such is defined in the FAR, and that even if such a potential conflict arises from the fact of common ownership, it is properly mitigated by the [***] protections in place at CBRE as described in" CBRE's organizational conflict of interest submissions. *Id*. at 2921. And so, Mr. Terry concluded that there was "no unmitigated conflict of interest arising from the business relationship between CBRE and Trammell Crow Company" and that, in any event, it was "in the interest of the United States" to award the FCC Lease to Trammell Crow, notwithstanding Parcel 49C's allegation of an unmitigated conflict of interest. *Id*. at 2921.

### 4.   Parcel 49C's GSA And GAO Protests

Prior to commencing this litigation, Parcel 49C filed several protests before the GSA and the Government Accountability Office ("GAO") related to the RLP.  *Id*. at 51-221, 248-266, 287-93, 1103-1250.  On October 20, 2015, Parcel 49C filed an agency-level protest with the GSA challenging the RLP's ceiling height and dual power feed requirements.  *Id*. at 287-93.  The GSA denied Parcel 49C's protest on December 2, 2015.  *Id*. at 224-32.  On November 16, 2015, Parcel 49C filed a second agency-level protest challenging, among other things, the RLP's requirement that offerors comply with the RLP's NEPA-related requirements.  *Id*. at 248-66.  The GSA dismissed Parcel 49C's second agency-level protest on December 15, 2015.  *Id*. at 222-23.

In December 2015, Parcel 49C filed a protest with the GAO, challenging, among other things, the RLP's first floor ceiling height and dual power feed requirements, the GSA's interpretation of the RLP's NEPA-related requirements, and the GSA's consideration of relocation and move-related costs.  *Id*. at 51-221, 1103-1250.  The GAO dismissed-in-part and denied-in-part this protest on March 23, 2016.  *Id*. at 1414-26.

### B.   Relevant Procedural History

On April 4, 2016, Parcel 49C filed the complaint in this bid protest matter.  *See generally* Compl.  Parcel 49C subsequently amended the complaint on May 19, 2016 and on June 9, 2016.  *See generally* Pl. 1st Am. Compl.; Pl. 2d. Am. Compl.

On April 14, 2016, the government filed the administrative record in this matter.  *See generally* 1st AR.  The government subsequently amended the administrative record on May 20, 2016, and later supplemented the administrative record on July 26, 2016, with the Declaration of Cirilo Paulo.  *See generally* AR; SAR.  On May 5, 2016, plaintiff filed a motion to supplement the administrative record with certain expert reports that were commissioned by Parcel 49C pertaining to the RLP's ceiling height and dual power feed requirements.  *See generally* Pl. Mot. to Supp.  The government filed a response and opposition to Parcel 49C's motion to supplement on June 24, 2016.  *See generally* Def. Opp. to Mot. to Supp.

On May 5, 2016, Parcel 49C also filed its first motion for judgment upon the administrative record.  *See generally* Pl. 1st Mot.  Subsequently, on June 10, 2016, Parcel 49C

filed a second motion for judgment upon the amended administrative record.[3]  *See generally* Pl. 2d. Mot.

On June 3, 2016, Trammell Crow filed a motion to intervene in this matter, which the Court granted on June 9, 2016.  *See generally* Int. Mot. to Intervene.  Thereafter, on June 24, 2016, the government filed a partial motion to dismiss this matter and motion for judgment upon the administrative record, and Trammell Crow filed a motion for judgment upon the administrative record.  *See generally* Def. Mot.; Int. Mot.

On August 12, 2016, Parcel 49C filed a reply in support of its motion for judgment upon the administrative record and a response to the government's partial motion to dismiss and motion for judgment upon the administrative record and to Trammell Crow's motion for judgment upon the administrative record.  *See generally* Pl. Reply.  On September 2, 2016, the government and Trammell Crow filed their respective replies in support of their motions for judgment upon the administrative record.  *See generally* Def. Reply; Int. Reply.

Lastly, on October 18, 2016, Parcel 49C filed a motion for leave to file a sur-reply in response to the government's reply.  *See generally* Pl. Mot. for Sur-Reply.  On October 20, 2016, and October 21, 2016, respectively, the government and Trammell Crow filed their responses and opposition to Parcel 49C's motion for leave to file a sur-reply.  *See generally* Def. Opp. to Sur-Reply; Int. Opp. to Sur-Reply.

These matters having been fully briefed, the Court addresses the pending motions.

## III.   LEGAL STANDARDS

### A.   Jurisdiction And Bid Protests

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed

---

[3] On May 24, 2016, Parcel 49C filed a notice withdrawing Counts I-V and Count XII of its first amended complaint.  *See generally* Pl. Notice.  On May 25, 2016, plaintiff also filed a motion to seal this notice. *See generally* Pl. Mot to Seal.

procurement." 28 U.S.C. § 1491(b)(1).  In bid protest cases, this Court reviews agency actions under the "arbitrary and capricious" standard.  *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review set forth in the Administrative Procedure Act).  And so, under the Administrative Procedure Act standard, an award may be set aside if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  The United States Court of Appeals for the Federal Circuit has explained that:

> When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Id.* at 1351 (citations omitted).

In reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted).  And so, the Court should not substitute its judgment for that of the agency.  *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997).  "The protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law" or procedure.  *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) ("*ITAC*"); *see also Bannum, Inc. v. United States*, 60 Fed. Cl. 718, 723 (2004); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003).  This standard "is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

In addition, as long as there is "a reasonable basis for the agency's action, the Court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ."  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citations

omitted).  But, if "the agency 'entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the resulting action lacks a rational basis and, therefore, is defined as arbitrary and capricious. *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### B.      Judgment Upon The Administrative Record And Injunctive Relief

Generally, Rule 52.1 limits this Court's review of an agency's procurement decision to the administrative record.  RCFC 52.1; *see Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) ("[T]he focal point for judicial review should be the administrative record already in existence.").  And so, unlike a summary judgment motion brought pursuant to Rule 56, the existence of genuine issues of material fact does not preclude judgment upon the administrative record under Rule 52.1.  *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); RCFC 56.  Rather, the Court's inquiry is whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

In addition, under its bid protest jurisdiction, the Court "may award any relief [it] considers proper, including declaratory and injunctive relief . . . ."  28 U.S.C. § 1491(b)(2); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  In deciding whether to issue a permanent injunction, the Court considers: (1) whether the plaintiff has succeeded upon the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); s*ee also Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.");  *Centech Grp., Inc.*, 554 F.3d at 1037.  These four factors are to be considered collectively, rather than individually, such that "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  Conversely, "the absence

of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. *Id*.

A plaintiff who cannot demonstrate actual success upon the merits cannot prevail upon its motion for permanent injunctive relief. *Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004) (finding that a party that cannot demonstrate likely success upon the merits cannot prevail upon its motion for preliminary injunctive relief), *reh'g* and *reh'g en banc* denied. This Court has also found success upon the merits to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." *Dellew Corp. v. United States*, 108 Fed. Cl. 357, 369 (2012) (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 312 (Fed. Cir. 2007)). However, while success upon the merits is necessary, it is not sufficient alone for a plaintiff to establish that it is entitled to injunctive relief. *See Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 353 (2012) ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing *PGBA, LLC*, 389 F.3d at 1228-29).

### C.     Supplementing The Administrative Record

The United States Court of Appeals for the Federal Circuit has held that the "focal point" of the Court's review of an agency's procurement decision "'should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). By limiting its review to the "record actually before the agency" the Court guards against "using new evidence to 'convert the 'arbitrary and capricious' standard'" applicable to bid protest actions "'into effectively *de novo* review.'" *Id*. at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000)). And so, the "parties' ability to supplement the administrative record is limited" and the administrative record should only be supplemented "if the existing record is insufficient to permit meaningful review consistent with the APA." *Id*. at 1379-81; *see also Caddell Constr. Co., Inc. v. United States*, 111 Fed. Cl. 49, 93 (2013); *DataMill, Inc. v. United States*, 91 Fed. Cl. 722, 732 (2010) (Plaintiff "bears the burden of explaining why the agency-assembled administrative record is insufficient.").

16

This Court has interpreted the Federal Circuit's directive in *Axiom* to mean that supplementation of the administrative record is permitted to correct mistakes and fill gaps. *L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 672 (2009). But, supplementation of the administrative record is not permitted when the documents proffered are unnecessary for an effective review of the government's procurement decision. *Id*. And so, supplementation of the administrative record is appropriate when necessary to provide the Court with a record containing the information upon which the agency relied when it made its decision, as well as any documentation revealing the agency's decision-making process. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see also Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 225 (2004) ("'[S]upplementation might be necessary to help explain an agency's decision and thereby facilitate meaningful judicial review of the agency decision, particularly when a subjective value judgment has been made but not explained.'") (quoting *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343-44 (2004) (finding that supplementation is warranted when it is missing "relevant information that by its very nature would not be found in an agency record--such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations")).

## IV.   ANALYSIS

In its motion for judgment upon the administrative record, Parcel 49C challenges the GSA's evaluation process for the RLP upon five grounds. First, Parcel 49C alleges that the GSA should have determined that Trammell Crow is ineligible for award of the FCC Lease due to an organizational conflict of interest that cannot be mitigated and because Trammell Crow was not the single owner of the property that it proposes for the FCC Lease at the time its proposal was submitted to the GSA. Second, Parcel 49C alleges that certain requirements in the RLP unduly restrict competition and prejudice Parcel 49C. Third, Parcel 49C alleges that the GSA improperly required Parcel 49C to provide certain NEPA-related documentation in connection with Parcel 49C's offer, in violation of the RLP's terms and applicable law. Fourth, Parcel 49C alleges that the GSA's evaluation of responsive proposals was improper because the agency did not consider certain move-related and relocation costs in connection with its evaluation of offerors' prices and because the GSA's IGE had not been properly documented by the agency. Lastly, Parcel 49C alleges that the GSA failed to conduct meaningful discussions with Parcel 49C regarding its proposed price.

The government and Trammell Crow both counter that the administrative record in this matter shows that the GSA conducted a reasonable evaluation process for the RLP, in accordance with the requirements of the RLP and applicable law.  For the reasons discussed below, the Court agrees.  And so, the Court **DENIES** Parcel 49C's motion for judgment upon the administrative record and **GRANTS** the government's cross-motion for judgment upon the administrative and Trammell Crow's cross-motion for judgment upon the administrative record.

### A.      Supplementation Of The Administrative Record Is Not Warranted

As a preliminary matter, the Court must deny Parcel 49C's request to supplement the administrative record in this case with certain expert reports commissioned by Parcel 49C, because these reports do not fill any gaps in the administrative record and directly address the legal issues that the Court must resolve in this matter.  *See generally* Pl. Mot. to Supp.  In its motion to supplement, Parcel 49C seeks to supplement the administrative record with an expert engineering systems design and services report prepared by [***] and an expert engineering report prepared by [***].  *Id*.  Parcel 49C commissioned these expert reports to support its challenge to the RLP's ceiling height and dual power feed requirements.  *Id*.

Parcel 49C argues that these expert reports should be added to the administrative record because they will ensure effective judicial review of this matter.  *Id*.  A review of the administrative record and the subject reports reveals, however, that Parcel 49C's request to supplement the extensive administrative record in this case is without merit.

First, it is well established that the Court may permit a party to supplement the administrative record if such supplementation is meaningful to judicial review.  *L-3 Commc'ns EOTech*, 87 Fed. Cl. at 672.  But, it is also well established that supplementation of the administrative record with matters that address the legal issues before the Court is not appropriate.  *Id*. (denying supplementation of the administrative record because plaintiff's proffered declaration "directly addresses the dispute before the court–whether the government's decision to eliminate [the protester] from this competition . . . was arbitrary or capricious").  In this case, Parcel 49C seeks to supplement the administrative record with expert reports that directly address one of the legal disputes in its bid protest—whether the RLP's ceiling height and dual power feed requirements are rationale.  *See generally* Pl. Mot. to Supp; AR at 188-89, 204-07.  It is not appropriate for the Court to supplement the administrative record with this kind of

information.  *L-3 Commc'ns EOTech*, 87 Fed. Cl. at 672.  And so, Parcel 49C's request that the Court do so in this case is without merit.

Supplementation of the administrative record with the subject expert reports is also not appropriate because these reports do not fill a gap in the administrative record.  The government has filed an extensive administrative record in this matter, which it has subsequently amended and supplemented, to ensure that the administrative record contains the information that the GSA considered in evaluating proposals responsive to the RLP.  *See generally* 1st AR; AR; SAR. While the expert reports that Parcel 49C seeks to add to the administrative record do provide an alternative point of view about the merits of the RLP's ceiling height and dual power feed requirements, these reports simply do not fill any gaps in the administrative record about the GSA's evaluation process for this procurement.  *RhinoCorps Ltd. Co.,* 87 Fed. Cl. at 282 (denying supplementation of the administrative record with facts that substitute plaintiff's opinion for the agency's determinations).  Given this, supplementing the administrative record with these expert reports would run afoul of the Federal Circuit's clear directive in *Axiom* that the "focal point" of the Court's review in a bid protest matter should be the administrative record already in existence and not a record made in the reviewing court.  *Axiom Res. Mgmt.*, 564 F.3d at 1379.

**B.      The Administrative Record Shows That**
**The GSA Conducted A Reasonable Evaluation**
**Process In Accordance With The RLP And Applicable Law**

The administrative record in this matter also shows that the GSA's evaluation process for the RLP was both reasonable and in accordance with the requirements of the RLP and applicable law.  The Court reviews the GSA's actions with respect to the evaluation process for the RLP under the arbitrary and capricious standard and the Court will not substitute its judgment for that of the agency.  *See* 28 U.S.C. § 1491(b)(4); *Citizens to Pres. Overton Park*, 401 U.S. at 415; *Cincom Sys., Inc.*, 37 Fed. Cl. at 672.  Applying this framework, the Court addresses each of Parcel 49C's five challenges to the GSA's evaluation process in connection with the RLP below.

**1.      Parcel 49C's Claim That Trammell Crow Is Ineligible**
**For Award Is Unsubstantiated By The Record Evidence**

As an initial matter, the administrative record does not substantiate Parcel 49C's claim that Trammell Crow is ineligible for award of the FCC Lease.  Parcel 49C challenges Trammell

Crow's eligibility for an award upon two grounds.  First, Parcel 49C contends that Trammell Crow is ineligible for award due to an organizational conflict of interest that cannot be mitigated. Pl. 2d. Mem. at 20-21, 28-31.  Second, Parcel 49C also contends that Trammell Crow is ineligible for award because Trammell Crow has not complied with the RLP's single owner requirement.  Pl. 2d. Mot. at 2; Pl. 2d. Mem. at 2, 17-20, 31-33.  For the reasons discussed below, neither of Parcel 49C's arguments are supported by the administrative record.

**a.      Parcel 49C Has Not Demonstrated The Existence Of An Unmitigated Organizational Conflict Of Interest**

First, the administrative record shows that the GSA extensively investigated a potential organizational conflict of interest arising from the business relationship between Trammell Crow and the broker for the FCC Lease, CBRE.  The administrative record also shows that the GSA appropriately determined that such an OCI could be, and had been, mitigated in this case.

The United States Court of Appeals for the Federal Circuit has held that the FAR obligates an agency to conduct an organizational conflict of interest analysis for significant conflicts and that contracting officers are given broad discretion in determining whether a potential conflict of interest is significant.  *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (holding that agencies are only required to document "significant potential conflicts"); 48 C.F.R. § 9.504(a)(2).  "'A significant potential conflict [of interest] is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders.'"  *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011) (quoting *PAI Corp.*, 614 F.3d at 1352).  In addition, an organizational conflict of interest exists when, "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage."  48 C.F.R. § 2.101.  And so, the FAR obligates a contracting officer to "analyze planned acquisitions in order to . . . [a]void, neutralize, or mitigate significant potential conflicts before contract award."  48 C.F.R. § 9.504(a)(2).

In this case, the administrative record demonstrates that the GSA identified and properly investigated an OCI arising from the business relationship between CBRE and Trammell Crow

on two separate occasions, to ensure the integrity of the procurement process for the FCC Lease. In this regard, the record evidence shows that CBRE first disclosed its dual agency relationship with Trammell Crow to the GSA in April 2016. AR at 2928-31. The record evidence also shows that, thereafter, the GSA's National Capital Region Regional Contracting Officer, Aliza Brown investigated the OCI and issued a "National Broker Contract Contracting Officer Finding and Determination" finding an organizational conflict of interest with respect to the relationship between CBRE and Trammell Crow that could be, and had been, mitigated. *Id*. at 2924-26.

After Parcel 49C commenced this matter, the GSA conducted a second investigation to determine whether Trammell Crow had an OCI due to its relationship with CBRE. *Id*. at 2918-21. Specifically, the administrative record demonstrates with respect to this OCI investigation that the GSA's COTR, Kevin Terry, "approached CBRE for information about the alleged conflict" and found that [***]." *Id*. at 2919. In particular, the administrative record shows that Mr. Terry learned "that Trammel[l] Crow Company had its [***]. *Id*. at 2921. And so, on July 22, 2016, Mr. Terry issued findings concluding that that there is no unmitigated conflict of interest arising from the business relationship between CBRE and Trammell Crow.[4] *Id*.

The record evidence also shows that the GSA reasonably determined that the OCI involving CBRE and Trammell Crow could be, and had been, mitigated in this case. In this regard, Mr. Terry determined in his findings that "the [***] and safeguards [that CBRE has] in place that are adequate to mitigate the possibility of an internal organizational conflict of interest within CBRE itself, are certainly adequate to mitigate the possibile [sic] organizational conflict of interest that might exist between rival firms in common ownership." *Id*. at 2920. There is no dispute in this case that the CBRE's [***] and other safeguards were in place when Trammell Crow submitted its offer for the FCC Lease. *Id*. at 2922. And so, the administrative record demonstrates that the GSA reasonably and appropriately determined that the OCI involving Trammell Crow and CBRE could be, and had been, mitigated.

---

[4] Mr. Terry also found that, "to the extent that there is an ongoing allegation of the existence of an unmitigated conflict of interest arising from the business relationship between CBRE and Trammel[l] Crow Company, it is in the interest of the United States to award the lease contract [to Trammell Crow]." AR at 2921.

Parcel 49C's argument that this OCI cannot be mitigated, because the CBRE personnel who evaluated Trammell Crow's proposal have a financial interest in selecting Trammell Crow for award, is also unsubstantiated by the administrative record. Pl. 2d. Mem. at 30-31. The record evidence makes clear that Trammell Crow [***] and the company operates independently from CBRE. AR at 2920-21. And so, these CBRE employees do not have a financial interest in the award of the FCC Lease to Trammell Crow.

Parcel 49C's contention that CBRE's "dual role as evaluator and simultaneous offeror creates the appearance of impropriety, which by itself warrants Trammel[l] Crow's disqualification," is similarly without support in the record evidence. Pl. 2d. Mem. at 30. Rather, the administrative record demonstrates that CBRE appropriately disclosed its dual agency relationship with Trammell Crow to the GSA and to all interested parties in this lease procurement to avoid any appearance concerns. *Id*. at 2925. And so, again, the record simply does not support Parcel 49C's argument that the OCI resulting from Trammell Crow's relationship with CBRE cannot be mitigated.[5]

### b.     Parcel 49C Has Not Demonstrated That Trammell Crow Violated The RLP's Single Owner Requirement

The record evidence also does not substantiate Parcel 49C's argument that Trammell Crow is ineligible for award of the FCC Lease because Trammell Crow has not satisfied the RLP's single owner requirement. Pl. 2d. Mem. at 18-20, 31-33, 59. In this regard, Parcel 49C argues in essence that Trammell Crow is ineligible for award of the FCC Lease because the company was not the single owner of the parcel that it proposes for the FCC Lease at the time that Trammell Crow submitted its final proposal. Pl. 2d. Mem. at 31-33. A plain reading of the RLP makes clear, however, that the RLP does not require that an offeror be a single owner when the company submitted its proposal.

---

[5] Parcel 49C's reliance upon FAR § 9.505-3 to argue that the GSA's OCI determination with respect to Trammell Crow and the FCC Lease is improper and similarly misguided. As the government notes in its motion, Section 9.505-3 has no application to the FCC Lease at issue here. 48 C.F.R. § 9.505-3 (requiring that contracts for the evaluation of offers for products or services shall not be awarded to a contractor that will evaluate its own offers or those of a competitor without proper safeguards to ensure objectivity); Def. Reply at 18-20.

Specifically, the RLP requires that, "to qualify as one (1) building, the offered space must be owned by a single Offeror and the structures if more than one, must be connected internally on at least 60% of the offered floors, as determined by and at the discretion of the LCO."  AR at 1497, 1687-88.  The administrative record also shows that in its final proposal Trammell Crow represented to the GSA in the company's final proposal that Trammell Crow would comply with this requirement if awarded the FCC Lease.  *Id*. at 2782, 2807-08.  The administrative record also shows that Trammell Crow reaffirmed its intention to satisfy the RLP's single owner requirement in an opinion letter from the company's special counsel, which described in detail the process through which Trammell Crow could form a new entity to qualify as a single owner under the terms of the RLP upon award of the FCC Lease.  *Id*. at 2782, 2807-08.

Given this factual evidence, the administrative record plainly demonstrates that Trammell Crow has stated its intention to satisfy the RFP's single owner requirement if awarded the FCC Lease.  The RLP requires nothing more of Trammell Crow in this regard.  *Id*. at 1497, 1687-88.  And so, the GSA reasonably determined that Trammell Crow is eligible for award of the FCC Lease and that the company will comply with the RLP's single owner requirement if awarded the FCC Lease.

### 2.    The RLP's Requirements Do Not Unduly Restrict Competition

Parcel 49C's argument that the RLP's ceiling height and dual power feed requirements unduly restrict competition are similarly without support in the administrative record.  Pl. 2d. Mem. at 45-53.  This Court has recently held that, when examining whether a particular procurement requirement unduly restricts competition, the Court inquires whether the restrictive requirements are required to meet the government's minimum needs.  *Id*.; *Am. Safety Council, Inc.*, 122 Fed. Cl. 426, 435 (2015); *see also* 41 U.S.C. § 253a(a).[6]  If a solicitation requirement violates the prohibition against restrictive terms that are not required to meet the government's minimum needs, the requirement is deemed to be unduly restrictive and an agency's decision to include the requirement in the solicitation will be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Id*. at 436 (citing *Redland Genstar, Inc. v. United States,* 39 Fed. Cl. 220, 231 (1997); *see also Wit Assocs., Inc. v. United States*, 62 Fed.

---

[6] The Competition in Contracting Act ("CICA") requires full and open competition through the use of competitive procedures.  41 U.S.C. § 3301(a)(1).

Cl. 657, 662 (2004) ("A solicitation must seek proposals that meet an agency's minimum needs, or else the solicitation represents an undue, improper restriction on competition. . . ").

The Federal Circuit has also held that a plaintiff bears the burden of showing that a restrictive solicitation term "is so plainly unjustified as to lack a rational basis." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286-87 (Fed. Cir. 2010). And so, to determine whether a requirement is unduly restrictive here, the Court asks both whether the requirement "is so plainly unjustified as to lack a rational basis," and whether the allegedly restrictive term is required to meet the government's minimum needs. *Id.*; *Am. Safety Council, Inc.*, 122 Fed. Cl. at 435. The Federal Circuit has also held that an agency's preferences with respect to a procurement are entitled to great weight. *Savantage Fin. Servs., Inc.*, 595 F.3d at 1286. And so, determining the agency's minimum needs is a matter that falls within the broad discretion of the agency–and not a matter for the Court to second guess. *Savantage* at 1286; *Wit Assocs., Inc.*, 62 Fed. Cl. at 662.

Here, the administrative record clearly shows that the RLP's ceiling height requirement is rational and designed to meet the government's legitimate needs, because this requirement will ensure that the FCC has adequate space to conduct the agency's press and public relations events on the first floor of the FCC's new headquarters. AR at 668-69. In particular, the RLP requires that "[t]he first (1st) floor of the offered building must have a minimum finished ceiling height of 11'6.'" *Id.* at 1497. The administrative record makes clear that the RLP's ceiling height requirement will permit the FCC "to provide unobstructed views of the entire space anywhere within the room . . . . [and l]arge monitors . . . mounted to walls throughout the room to provide visibility for the audience of any presentations." *Id.* at 668-69. The need to have suitable space for press and public relations events is a legitimate need of the FCC, and the RLP's ceiling height requirement reasonably addresses this need. And so, the administrative record demonstrates that the RLP's ceiling height requirement is a rational requirement designed to meet the FCC's legitimate needs in this case. *Savantage. Fin. Servs.*, 595 F.3d at 1286-87.

The administrative record also demonstrates that the RLP's dual power feed requirement—which requires that the power and communication circuits in the FCC's new headquarters have more than one point of entry—is also rationale and designed to meet the FCC's minimum needs. *See* AR at 1497 (RLP at Exhibit B ¶ 11). In this regard, the RLP provides, in relevant part, that:

24

> The Government requires power and communication circuits that have more than one point of entry coming into the Building (multiple independent conduits coming from the street to the facility, with at least 25 feet of physical separation). . . . The Government requires redundancy for communications and power. Communications requires dual redundant 10-gigabit circuit, with more than one cable infrastructure.

*Id*. at 526, 1497 (Exhibit B, paragraph 11).  The government also represents that the FCC's Public Safety & Homeland Bureau Command Center ("PSHSB")−which coordinates the FCC's activities with respect to, among other things, public safety, homeland security and national security−is housed within the FCC's headquarters.  *Id*. at 687, 1498, 1588-89; *see also* 47 C.F.R. § 0.191(b).  And so, to ensure that the PSHSB can perform its mission, the RLP requires power redundancy through dual power feeds at the FCC's new headquarters.  AR at 1498, 1588-89.

Again, the RLP's dual power requirement is both rational and intended to meet a demonstrated need upon the part of the FCC to fulfill its public safety mission.  Given this, the dual power feed requirement does not unduly restrict the competition for the FCC Lease.  *Savantage Fin. Servs.*, 595 F.3d at 1287; *Am. Safety Council, Inc.*, 122 Fed. Cl. at 435.  And so, the Court will not set aside this reasonable solicitation requirement.

Lastly, it is also important to note that, while there may be other options for meeting the FCC's needs with respect to public relations and public safety, re-examining those options is not the role of this Court when determining whether the RLP's requirements unduly restrict competition.  *Savantage Fin. Servs.*, 595 F.3d at 1286 ("And determining an agency's minimum needs 'is a matter within the broad discretion of agency officials . . . and is not for[the] court to second guess.'") (citations omitted) (brackets existing).  The government has demonstrated that both the ceiling height and dual power feed requirement in the RLP are rational.  As a result, Parcel 49C has not met its burden to show that these RLP's requirements unduly restrict competition.

### 3.    The RLP's NEPA-Related Requirements Are Also Reasonable

To the extent that Parcel 49C can challenge the RLP's requirements with respect to NEPA compliance in this litigation, the record evidence also shows that these requirements are

reasonable.[7]  In its motion, Parcel 49C argues that the RLP's NEPA-related requirements are unreasonable, and that Parcel 49C should be exempt from these requirements, because Parcel 49C will not construct a new building if awarded the FCC Lease.  AR at 54-58; Pl. 2d Mem. at ¶¶ 47-56.  For the reasons discussed below, Parcel 49C's claim is without merit.

With respect to the NEPA compliance, the RLP provides, in relevant part, that:

> The Government reserves the right to reject any offer where (i) the NEPA-related documentation provided by the Offeror for the offered Property is inadequate, (ii) the offer entails unacceptably adverse impacts on the human environment, (iii) the identified adverse impacts cannot be readily mitigated, or (iv) the level of NEPA analysis is more extensive than is acceptable to the Government (*e.g.*, offers must be of a nature that would allow NEPA to be satisfied by preparation of a Categorical Exclusion (CATEX) NEPA study or an Environmental Assessment (EA) with or without mandatory mitigation).

*Id*. at 1438-39.  The record evidence also shows that the GSA determined that it was necessary for all offerors to comply with these requirements so that the agency could determine the environmental impact of the award of the FCC Lease.  *Id*. at 1444, 1449-50.

Parcel 49C's numerous challenges to the RLP's NEPA-related requirements lack support in the administrative record for several reasons.  First, contrary to Parcel 49C's contentions in this case, the RLP clearly requires that all offerors, including Parcel 49C, provide NEPA documentation to be eligible for award of the FCC Lease.  *Id*. at 1438-39, 1444, 1449-50.  Second, the administrative record similarly does not support Parcel 49C's contention that Parcel 49C should be exempt from the RLP's NEPA-related requirements, because the company will not [***] if awarded the FCC Lease.  *Id*. at 26, 38; Pl. 2d Mem. at ¶¶ 47-56.  Rather, the administrative record shows that the GSA determined that Parcel 49C would have to [***] if awarded the FCC Lease and that [***] impacts.  *Id*. at 26 ("[T]he government anticipated [***] should the incumbent Lessor prevail in the procurement.").

---

[7] It is undisputed in this case that Parcel 49C did not raise its challenge to the RLP's NEPA-related requirements before it submitted its offer for the FCC Lease.  *See* AR at 287-293.  This Court has long recognized that an offeror wishing to challenge the terms of a solicitation must do so before the close of the proposal process.  *Blue & Gold Fleet, L.P.*, 492 F.3d at 1313 (holding that a protester who knew the agency's interpretation of a solicitation but failed to challenge it before bids were due, waived its ability to object afterwards).  And so, Parcel 49C has waived this claim under *Blue & Gold Fleet*.

In addition, Parcel 49C's argument that it is entitled to a Categorical Exclusion ("CATEX") from certain NEPA requirements also lacks evidentiary support. The administrative record makes clear that the RLP requires that Parcel 49C, and all other offerors, provide all relevant NEPA-related documentation to the GSA before the agency would take any action with respect to a CATEX. *Id*. at 1438-39, 1444, 1449-50. Given this, there is ample evidence in the record to demonstrate that the GSA properly determined that Parcel 49C and all other offerors must fully comply with the RLP's NEPA-related requirements.

### 4. The GSA Appropriately Evaluated The Costs Associated With The FCC Lease Consistent With The RLP

Parcel 49C's attempt to set aside the GSA's evaluation process for the RLP due to alleged errors in the evaluation of the price factor for the solicitation are similarly without merit. Pl. 2d. Mem. at 34-44. In this regard, Parcel 49C puts forward two arguments. First, Parcel 49C contends that the GSA failed to properly consider certain move-related and relocation costs, and the impact of such costs on the price for the FCC Lease. *Id*. at 34-37. Second, Parcel 49C contends that the GSA's IGE for the RLP was unreasonable and not developed in accordance with the terms of the RLP. *Id*. at 37-43; Pl. Reply at 27-36. For the reasons discussed below, Parcel 49C's arguments are belied by the record evidence.

With respect to move-related and relocation costs, a plain reading of the RLP makes clear that the RLP did not require the GSA to consider such costs when evaluating responsive proposals. The RLP provides, in relevant part, that the GSA will consider and add "[t]he cost of relocation of furniture, telecommunications, replications costs, and other move-related costs [to the gross present value cost], *if applicable.*" AR at 1447 (emphasis supplied). This language does not require that the GSA consider move-related or relocation-related costs in its evaluation of an offeror's price. *Id*. Rather, this provision makes clear that the GSA has the discretion to consider such costs, if the contracting officers deems the costs applicable. *Id*.

In this case, the administrative record demonstrates that the GSA's contracting officer for the RLP reasonably determined that it was not necessary for the GSA to consider certain move-related and relocation costs during the evaluation of responsive proposals, because the cost of staying in the incumbent building and moving to another building were similar. *Id*. at 37. The RLP does not prohibit the GSA from exercising its discretion regarding these costs in this manner. AR at 1447. And so, Parcel 49C's claim to the contrary is simply without merit.

The administrative record in this case also shows that the GSA appropriately developed the IGE for this procurement.  This Court has long recognized that, "[g]enerally, independent government estimates represent the agency's best estimate of the most reasonable current price of the products or services being procured."  *Process Control Techs. v. United States*, 53 Fed. Cl. 71, 77 (2002) (quotation omitted).  While an agency is not required to support its IGE with "exhaustive detail," it must "be able to demonstrate the basis for the estimate" when the IGE "is questioned."  *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 594 (2003).  And so, this Court has also held that an agency may utilize prior experience– historical information– to create the IGE and that "agencies are 'given broad latitude in establishing [a] method to evaluate price proposals.'"  *MED Trends, Inc. v. United States,* 102 Fed. Cl. 1, 7 (2011) (citations omitted).

The administrative record here contains ample support for the GSA's IGE.  In particular, the administrative record demonstrates that the GSA engaged in a lengthy and thoughtful process to develop the IGE, by first commissioning the development of a program of requirements for the FCC's new headquarters and then developing the IGE.  AR at 310-18, 1577-1683.  In this regard, the record evidence shows that the GSA engaged the architectural firm OLBN to study the FCC's space needs.  *Id*. at 336-442; SAR at 2.  The record evidence also shows that, after studying the FCC's space needs and "compiling a summary of improvements required by FCC, OBLN priced its estimate of the costs to accomplish the work, based upon its professional knowledge of the costs prevailing in the Washington DC market for the work described."  SAR at 2.

The Declaration the GSA's Project Manager for the RLP, Cirilo Paulo, also demonstrates that the GSA further modified the cost estimates provided by OBLN to develop the GSA's IGE for this procurement.  Specifically, Mr. Paulo states in his declaration that he compared the costs in OLBN's estimates with his own experience on a similar NASA project to formulate the IGE.  *Id*. at 2-3.  Mr. Paulo's declaration also makes clear that he made several adjustments to the costs in OLBN's estimate based upon his experience and expertise.  *Id*. at 3.  For example, Mr. Paulo states in his declaration that he increased certain costs contained in OLBN's estimate because of his awareness that construction costs have been increasing due to greater construction activity in the Washington, DC market.  *Id*. at 3-4.  In addition, Mr. Paulo also describes several specific adjustments that he made to OLBN's cost estimates:

In response to these concerns, and in recognition that an IGE is intended to provide a basis for the tenant agency to budget adequate funds for the anticipated build-out, I made adjustments to certain cost estimates in the POR. These changes included both increasing assumed unit costs, as well decreasing assumed administrative charges.  I also corrected certain assumptions as to what Tenant Improvement Allowance (TIA) and Building Specific Amortized Capital (BSAC) funds would be available to defray out-of-pocket build-out costs.

a. I increased the per square foot construction cost estimates for the general office space and both the Low Cost Special Space and High Cost Special Space build-outs.

b. I increased the TIA from $35.00 to $46.74 to reflect the correct allowance available for this lease procurement.

c. I deleted the costs of a swing move from the "stay in place" scenario to reflect that the Government would only pay for one move.  Move costs were thus $5.00 per usable square foot for both scenarios.

d. I subtracted the BSAC, which is an allowance available to FCC to fund security costs, from both scenarios.  The BSAC is an additional allowance available for the new lease, which would decrease the FCC's out-of-pocket build-out costs.

e. I decreased both scenario's [sic] design cost percentage from [***] percent to [***] percent. This was done to reflect the fact that architectural firms are willing to take on large dollar projects such as this one for a lesser overall percentage charge than is the case for smaller dollar projects.

f. I decreased both scenario's [sic] lessor's fee from [***] percent to [***] percent. Once again, this is to reflect the market's acceptance of a lower percentage commission on large dollar projects.

*Id*. at 3-4 (internal citations omitted).  And so, the administrative record demonstrates that the GSA appropriately and independently developed the IGE in accordance with the terms of the RLP.  *Id*. at 1-4; AR at 310-18, 336-442, 1577-1683.

Lastly, Parcel 49C's argument that the GSA erred in this procurement by failing to revise the IGE after receiving responsive proposals is without any legal or factual support.  In fact, Parcel 49C cites to no statute or case to support this novel proposition.  *See generally* Pl. 2d. Mem.  Given this, Parcel 49C has simply not met its burden to show that the GSA's evaluation process was unreasonable, or that it has been prejudiced by the agency's actions in any way.

**5.    Parcel 49C's Claim That The GSA Failed To Conduct
Meaningful Discussions Is Unsubstantiated By The Record Evidence**

Parcel 49C's final challenge to the GSA's evaluation process—that the GSA failed to
conduct meaningful discussions regarding Parcel 49C's proposed price—is equally flawed.  Pl.
2d. Mem. at 58-59.  This Court has long recognized that discussions regarding a proposal
submitted in response to a government solicitation are deemed to be "meaningful if they
'generally lead offerors into areas of their proposals requiring amplification or correction, which
means that discussions should be as specific as practical considerations permit.'"  *Advanced
Data Concepts, Inc.*, 43 Fed. Cl. 410, 422 (1999) (internal quotations and citations omitted),
*aff'd*, 216 F.3d 1054 (Fed. Cir. 2000); *Process Control Techs.*, 53 Fed. Cl. at 81(2002); *World
Travel Serv. v. United States*, 49 Fed. Cl. 431, 439 (2001).  The Court has also recognized that
agencies have no obligation to discuss in detail all inadequate aspects of a proposal.  *Process
Control Techs.*, 53 Fed. Cl. at 81; *see also Labat-Anderson v. United States*, 42 Fed. Cl. 806, 835
(1999).  Rather, an agency should tailor the discussions to the offeror and an agency's advice that
an offeror's proposed price is higher than the government's estimate satisfies the requirement to
conduct meaningful discussions.  *World Travel Serv.*, 49 Fed. Cl. at 439; *Process Control
Technologies*, 33 Fed. Cl. at 81.  And so, the decision to conduct discussions—and the scope of
any such discussions—is left to the judgment of the contracting officer.  *World Travel Serv.*, 49
Fed. Cl. at 439; *Process Control Technologies*, 33 Fed. Cl. at 81.

Here, there is ample evidence in the administrative record to show that the GSA held
meaningful discussions with Parcel 49C.  Indeed, the record evidence shows that the GSA
communicated with Parcel 49C during the evaluation of Parcel 49C's proposal and that the GSA
identified some deficiencies with respect to Parcel 49C's proposal.  AR at 1702-04.  Specifically,
the GSA noted that Parcel 49C's proposal did not contain certain [***] required by the RLP.  *Id.*
The GSA also expressed a concern about how Parcel 49C's proposal addressed the RLP's [***]
requirement.  *Id.* at 1707, 1712.

More importantly, the record evidence also shows that the GSA did not identify Parcel
49C's proposed price as an area that required amplification or correction.  AR at 1702-04, 1707-
08, 1710-12, 2880-81, 2884.  Given this, the GSA had no obligation to discuss Parcel 49C's
proposed price, nor did the agency have any obligation to discuss every other area where the
Parcel 49C's proposal could be improved.  48 C.F.R. § 15.306(d)(3).  And so, again, the

administrative record demonstrates that the GSA conducted meaningful discussions with Parcel 49C and, thus, does not support Parcel 49C's claim to the contrary.

### C.     Parcel 49C Has Not Shown That It Is Entitled To Injunctive Relief

Given the many weaknesses in Parcel 49C's challenges to the GSA's evaluation process, Parcel 49C has also not demonstrated that it is entitled to the injunctive relief that it seeks in this case.  When determining whether to grant injunctive relief, the Court considers: (1) whether plaintiff has succeeded upon the merits of the case; (2) whether plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.  *PGBA, LLC*, 389 F.3d at 1228-29; *see also Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983).  In addition, where, as here, the evidence demonstrates that a plaintiff will not succeed upon the merits of its claims, a plaintiff cannot prevail upon a claim for injunctive relief.  *Cf. Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)) ("Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction" or a temporary restraining order); *Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd*., 357 F.3d 1319, 1325 (Fed. Cir. 2004) (finding that a party that cannot demonstrate likely success upon the merits cannot prevail upon its motion for preliminary injunctive relief), *reh'g* and *reh'g en banc* denied.

As discussed above, Parcel 49C has not demonstrated that any of its five challenges to the GSA's evaluation process for the FCC Lease are supported by the administrative record, or the relevant law.  Rather, the facts of this case make clear that the GSA's evaluation process was reasonable and complied with the requirements of the RLP.  Because Parcel 49C cannot demonstrate actual success upon the merits of its claims here, Parcel 49C cannot prevail upon its motion for permanent injunctive relief.  *Nat'l Steel Car, Ltd*., 357 F.3d at 1325.

### D.     The Parties' Other Pending Motions

As a final matter, the parties have filed several other motions that the Court must also resolve.  Parcel 49C has filed a motion for leave to file a sur-reply to the government's motion

for judgment upon the administrative record and a motion to file its notice withdrawing Counts I-V and Count XII of the first amended complaint under seal.  *See generally* Pl. Mot. for Sur-Reply, Pl. Mot. to Seal.  The government has also filed a partial motion to dismiss Parcel 49C's OCI claim, upon the ground that this claim is unripe.  *See generally* Def. Mot.

To aid the Court in the resolution of this matter, the Court **GRANTS** Parcel 49C's motions for leave to file a sur-reply to the government's motion for judgment upon the administrative record and to file its notice under seal.  Because the GSA has now completed the investigation into the alleged organizational conflict of interest involving Trammell Crow, the Court **DENIES**, as moot, the government's partial motion to dismiss.

V.     **CONCLUSION**

In sum, the administrative record in this case demonstrates that the GSA conducted a reasonable evaluation process for the RLP at issue in this litigation and that the agency's evaluation process complied with the terms of the RLP and applicable law.  Given this evidence, Parcel 49C has simply not shown that the GSA's actions here were arbitrary, capricious, an abuse of discretion, or not in accordance with the RLP or applicable law.

And so, for the foregoing reasons, the Court:

(1) **GRANTS** the government's motion for judgment upon the administrative record and Trammell Crow's motion for judgment upon the administrative record;

(2) **DENIES** Parcel 49C's motion for judgment upon the administrative record;

(3) **DENIES** Parcel 49C's motion to supplement the administrative record;

(4) **GRANTS** Parcel 49C's motion to file certain documents under seal and motion for leave to file a sur-reply; and

(5) **DENIES**, as moot, the government's partial motion to dismiss.

Judgment shall be entered accordingly.

Each party shall bear their own costs.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the protective order entered in this matter on April 6, 2016.  This Memorandum Opinion and Order shall therefore be filed under seal.  The parties

shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the Protective Order prior to publication.

The Court hereby **ORDERS** the parties to **FILE**, by December 22, 2016, a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED.**


s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge